**Andrew LUDLUM, Petitioner,**

v.

**DEPARTMENT OF JUSTICE, Respondent.**

No. 01–3093.

United States Court of Appeals, Federal Circuit.

DECIDED: Jan. 28, 2002.

Lawrence Berger, Mahon & Berger, of Garden City, NY, argued for petitioner.

Patricia M. McCarthy, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With her on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and James M. Kinsella, Deputy Director; of counsel on the brief was Betsy J. Levensohn, Assistant General Counsel, Employment Law Unit II, Office of the General Counsel, Federal Bureau of Investigation, of Washington, DC.

Before GAJARSA, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and LINN, Circuit Judge.

Opinion for the court filed by Senior Circuit Judge FRIEDMAN, in which Circuit Judge LINN joins. Dissenting opinion filed by Circuit Judge GAJARSA.

FRIEDMAN, Senior Circuit Judge.

The Federal Bureau of Investigation ("FBI" or "Bureau") removed Andrew Ludlum ("Ludlum"), one of its special agents, for lack of candor (and other improprieties) during an administrative inquiry. The Merit Systems Protection Board ("Board") upheld the charge of lack of candor, but mitigated the removal penalty to a 120–day suspension. We affirm.

I

A. The basic facts are largely undisputed. While driving an official Bureau vehicle, the appellant Ludlum, an FBI special agent, stopped another automobile he thought might be stolen. He had an unauthorized passenger in his car: his daughter, whom he had picked up at her daycare center on his way home from work because his wife (who usually picked the girl up) had told him she had a situation at work that would prevent her from doing so. The driver of the stopped vehicle became angry at Ludlum and reported the incident to Ludlum's supervisor.

Supervisory Special Agent Liberatore and Supervisory Special Agent Bowe investigated the incident for the Bureau. They interviewed Ludlum on April 6, 1998. At the subsequent Board hearing, Bowe testified that when Liberatore asked Ludlum how many times he had picked up his daughter in a Bureau vehicle, Ludlum replied that he could not state how many times he had done so; that he did not think it was twelve; and that on some occasions he had picked her up in a Bureau vehicle and on others, in his own automobile.

Liberatore took notes during the interview, on the basis of which he prepared a seven page typewritten statement, dated April 6, 1998, for Ludlum to sign. Before signing and swearing to the statement on April 9, 1998, Ludlum made a handwritten change on page one of the statement: he changed "unauthorization" passenger to "unauthorized" passenger.

The written statement did not indicate that Ludlum was unable to say how many times he had transported his daughter in a Bureau vehicle. Instead, it stated as follows with respect to that question:

This was not the only occasion I picked up my daughter with a Buvehicle. Similar emergency circumstance [sic] occurred once in December, 1997 and once again in January, 1998. Other than these three occasions, I never had any other unauthorized person in a Buvehicle. I have had other persons, namely informants and Assistant United States Attorneys, in Buvehicles, but these were all work related.

The last sentence of the statement read: "I have read this statement of this and six other pages and it is true and correct."

On May 8, 1998, Ludlum signed and swore to a second statement. There he stated that he had "reviewed a number of records" from his daughter's daycare center; that "[a] number of these documents have my initials and time listed," that "[o]n those occasions I either picked up or dropped off my daughter," and that "[o]n each of these occasions, listed below, I used a Bureau automobile, without authorization, to pickup [sic] or drop off my daughter Annatje at this facility." The statement continued:

I did not mention this during my previous interview for fear of causing me further problems as I was uncertain of the previous occasions and apologize for leaving out these material facts. I am

aware, after reviewing these records that it was more than three occasions, as stated in my original statement; but those three occasions I mentioned earlier I remembered more vividly since my wife had called and each was an emergency situation.

The statement also indicated that "other than those occasions listed in this statement, as well as my statement of April 6, 1998, there may have been other occasions, which I can not recall, when I used a Bureau vehicle to transport my daughter from or to the Center."

The May 8 statement "list[ed] each occasion I either picked up or dropped my daughter off at the Center and my on-duty times, as reflected on the Attendance Register." Ludlum listed fourteen dates between February 25, 1997 and February 17, 1998, one of which was shown as a "drop off," and regarding two of which he stated "I probably used the Bureau vehicle, although I was off duty at 4:00 pm." (One of those two pickups was at 4:45 pm and the other at 5:20 pm.) Those dates were other than, and therefore in addition to, the three incidents revealed in the April 6 statement.

B. The Bureau determined that Ludlum had engaged in several improprieties and dismissed him. It ruled that he had made an unauthorized traffic stop, that he had "transported an unauthorized passenger in [his] Bureau vehicle," and that he "lacked candor during this inquiry." The Bureau noted that in his May 8 statement Ludlum "admitted that [he] picked up [his] daughter at the daycare center on more than three occasions," and that the daycare center records "indicate that [he] picked up [his] daughter on at least fourteen occasions." The Bureau official stated that Ludlum's "failure to be candid during this administrative inquiry has caused [the official] to question [Ludlum's]

effectiveness as an agent," and that "[Ludlum's] lack of candor during this inquiry has violated" specified "Bureau policies". The Bureau official further stated that he was

especially troubled by [Ludlum's] lack of candor during this inquiry. Furthermore, I find that [his] lack of candor, combined with the poor judgment [he] exhibited on February 27, 1998, the numerous instances of transporting an unauthorized passenger, and the multiple infractions of Time and Attendance policy, result in a totality of the circumstances that disqualify [Ludlum] from future employment with the FBI.

C. Ludlum appealed his removal to the Board. At a prehearing conference, the parties agreed that "the sole issue, at trial, will be the 'candor' matter." As the Board stated, "[a]t the hearing, the [Administrative Judge] found that the parties' stipulation 'will supersede the letter of proposed removal,' and that the stipulation 'defines the sole issue of the case and that sole issue is whether or not the Appellant evinced a lack of candor in his April 6, 1998 statement which he gave during his OPR [Office of Professional Responsibility] investigation.' ... Thus, contrary to the agency's contention, the stipulation superseded the notice of proposed removal, which contained additional charges, and the AJ properly adjudicated only the lack of candor charge." (internal citations omitted).

After a hearing, the Board's administrative judge reversed the Bureau's removal action. He held that "[t]o prove a charge of falsification an agency must prove by preponderant evidence that the employee knowingly supplies incorrect information with the specific intent of defrauding, deceiving, or misleading the agency." After summarizing and analyzing the testimony, the administrative judge concluded: "Hav-

ing produced no independent evidence bearing on appellant's intent to deceive, I find that the agency's evidence fails to prove by a preponderance that appellant intentionally withheld the truth with intent to deceive."

The full Board reversed the administrative judge's initial decision but mitigated the penalty to a 120 day suspension. The Board rejected the administrative judge's view that to prevail the Bureau was required to establish falsification. It held that

> the issue in this case is whether the agency proved a charge of "lack of candor," not a charge of falsification. The parties stipulated that the notice of proposed removal had been "superseded," and that the "sole issue of the case" was whether or not the Appellant evinced a "lack of candor." A "lack of candor" charge may encompass a broader range of misconduct than a falsification charge. (citations omitted)

The Board stated that "[t]his is a very close case on the merits of the agency's charge of lack of candor.... Nevertheless, as set forth below, we find that there is enough evidence to find that the agency met its burden of proving the lack of candor charge. We begin our analysis with the following key sentence in the April statement: 'Other than these three occasions, I never had any other unauthorized person in a Buvehicle.'" The Board reasoned:

> Yet when the appellant signed the statement indicating that he had transported his daughter on three emergency occasions, he clearly did not mention other occasions on which he had transported his daughter in a government vehicle, nor did he mention any uncertainty as to whether there were other occasions on which he had transported his daughter in a government vehicle.

In his May statement, the appellant admitted that he had transported his daughter in his government vehicle on twelve to fourteen occasions, and indicated that he did not mention these other occasions during his April interview "for fear of causing me further problems as I was uncertain of the previous occasions and apologize for leaving out these material facts." Similarly, the appellant admitted at the hearing that he was afraid of "undue reprisals" for speculating with respect to the number of times he transported his daughter in a government vehicle. He explained in an August 21, 1998 sworn statement that "[i]n an effort to move the OPR process along, I signed my [April 6] statement even though it was not completely accurate...." We therefore find that the appellant lacked candor in his April statement, i.e., did not respond fully and truthfully, when he failed to mention his uncertainty as to whether he had transported his daughter in his government vehicle, thereby creating an impression that there were only three occasions. (alterations in original) (internal citations omitted)

## II

The Board correctly rejected the administrative judge's apparent theory that the charge of lack of candor in this case was a charge of falsification, that to establish the latter charge the Bureau must establish that the employee had "[t]he intent to defraud or mislead the agency," and that the Bureau's proof failed because it did not establish that Ludlum "intentionally withheld the truth with intent to deceive." As the Board stated, "[a] 'lack of candor' charge may encompass a broader range of misconduct than a falsification charge."

■ Lack of candor and falsification are different, although related, forms of mis-

conduct, and the latter is not a necessary element of the former. Compare *Boyd v. Department of Justice*, 13 MSPB 97, 14 M.S.P.R. 427 (1983), *aff'd* 727 F.2d 1117 (Fed.Cir.1983) (Table), where the FBI charged an agent with several types of misconduct (including lack of candor) based upon responses he made during an interview, and falsification of official records (his daily attendance cards). There the Board treated these two charges as separate and distinct, and sustained the lack of candor charge but not the falsification charge. In *Gootee v. Veterans Administration*, 36 M.S.P.R. 526 (1988), the Board cited *Boyd* as holding that "when an underlying misconduct charge has been proven, a concealment or lack of candor charge must also be sustained based on appellant's failure to respond truthfully or completely when questioned about matters relating to the proven misconduct." *Id.* at 529.

■ Falsification involves an affirmative misrepresentation, and requires intent to deceive. *Naekel v. Dep't of Transp.*, 782 F.2d 975, 977 (Fed.Cir.1986). Lack of candor, however, is a broader and more flexible concept whose contours and elements depend upon the particular context and conduct involved. It may involve a failure to disclose something that, in the circumstances, should have been disclosed in order to make the given statement accurate and complete. It would be comparable to the distinction in the Federal securities laws governing securities registration statements between "an untrue statement of a material fact" and the failure "to state a material fact ... necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a) (2000).

In his testimony in this case Mr. DeFeo, the Assistant Director of the Bureau's Office of Professional Responsibility, who wrote the letter sustaining the charges against Ludlum and removing him, explained that "lack of candor is the generic term which has historically been used in FBI discipline which in its literal meaning means lack of forthrightness, lack of testifying truthfully including all the relevant circumstances. It has refinements. It can mean lying under oath in Court, lying under oath in an administrative hearing or it can be, in lesser type offense [sic], such as lying to a supervisor, not under oath, about work performance. So it can have various relations." Similarly, Mr. Figliuzzi, another Bureau official, stated that under the FBI Director's bright-line policy, "lack of candor," which includes failure "to reply fully and truthfully," and "l[ying] under oath, for example, during an administrative inquiry," would lead to dismissal from the agency.

The Bureau's regulations and instructions governing the conduct of its employees do not use the words "lack of candor." The words, however, apparently are well understood within the Bureau as a shorthand phrase for the myriad of situations that the concept covers. The standard is implicit in the statement in the Bureau's Manual of Administrative Operations and Procedures which, in Part I, Section 13, 13–4, states: "The employee must be entirely frank and cooperative in answering inquiries of an administrative nature."

The dissent contends that Board precedent requires a "showing of intent to deceive" in order to sustain a charge of lack of candor. We do not read the Board's prior decisions as announcing such a broad rule. In any event, the Board here has ruled that, in the factual circumstances of the present case, lack of candor is established by showing that the FBI agent did not "respond fully and truthfully" to the questions he was asked—a ruling with which we agree. Although lack of candor necessarily involves an element of decep-

tion, "intent to deceive" is not a separate element of that offense—as it is for "falsification."

According to the Administrative Judge, when, at the outset of the Board's proceeding, the parties stipulated that "the sole issue, at trial, will be the 'candor' matter," they thereby "define[d] the sole issue of the case" as "whether or not the Appellant evinced a lack of candor in his April 6, 1998 statement." The only issue properly before us, therefore, is whether the Board correctly determined that in his April 6, 1998 statement, Ludlum "evinced a lack of candor" because he "did not respond fully and truthfully" to the questions he was asked.

### III

■ We agree with the Board that substantial evidence in the record supports the Bureau's determination that Ludlum's April 6 statement lacked candor.

In that statement Ludlum acknowledged that on three occasions he had picked up his daughter with a Bureau vehicle. He then stated: "Other than these three occasions, I never had any other unauthorized person in a Buvehicle." That statement was ambiguous because it was unclear whether the reference to "other unauthorized persons" meant someone other than Ludlum (which would include his daughter) or someone other than his daughter. In the context, however, the statement at least suggested that Ludlum had not transported his daughter in a Bureau vehicle other than the three times he indicated.

In his May 8, 1998 statement, however, Ludlum admitted that in a twelve-month period from February 1997 to February 1998, he had picked up his daughter eleven times and probably twice more, and had dropped her off once. As noted, these were on different dates than the three incidents he admitted in his April 6

statement. He explained that "I did not mention [these other instances] during my previous interview for fear of causing me further problems as I was uncertain of the previous occasions and apologize for leaving out these material facts." He also stated that "there may have been other occasions, which I can not recall, when I used a Bureau vehicle to transport my daughter from or to the Center."

Ludlum did not seek to change his April 6 statement before signing it to indicate either that he could not remember how many times he had transported his daughter or that it was substantially more than three. Before signing, however, he had changed the word "unauthorization" to "unauthorized." If Ludlum believed that the April 6 statement presented to him was inaccurate or incomplete, he could have refused to sign it unless it were changed. Instead, he signed the statement, which ended with the words that "it is true and correct," without "mention[ing] his uncertainty as to whether he had transported his daughter in his government vehicle [on other occasions], thereby creating an impression that there were only three occasions."

This is not a case of only a minor variation between what was stated and what the true facts were. In the April 6 statement Ludlum admitted to three instances of unauthorized transportation of his daughter in a Bureau vehicle. In the May 8 statement, however, he admitted to so transporting her on twelve or fourteen additional occasions, and perhaps also on still "other occasions." Although Ludlum may not have been able on April 6 to recollect the exact number of times he transported his daughter, the gross disparity between the three instances he first admitted and the twelve to fourteen additional instances he admitted a month later indicates he

must have known it was substantially more than three. This conclusion, coupled with his later explanation for his earlier failure to mention these additional instances— "fear of causing me further problems"— demonstrated that he was less than candid in his April 6 statement. The Bureau may require the highest degree of candor from its agents.

## CONCLUSION

The decision of the Board is

*AFFIRMED.*

GAJARSA, Circuit Judge, dissenting.

The essence of this case is whether or not Mr. Ludlum, ("Ludlum"), a Special Agent working for the Federal Bureau of Investigation ("Bureau"), clearly answered questions when he became the subject of an investigation concerning the personal use of his official Bureau vehicle for driving his young daughter to and from daycare. The Bureau charged Ludlum with a lack of candor when he answered questions pertaining to the personal use of the vehicle during the inquiry. The Merit Systems Protection Board ("Board") administrative judge ("AJ") specifically found that in order to support a lack of candor charge the Bureau had to "prove ... that the employee knowingly supplies incorrect information with the *specific intent* of defrauding, deceiving or misleading the agency." (emphasis added). Consequently, the AJ reversed the Bureau's removal action. The Board, in turn, reversed the AJ on the basis that the Bureau had specifically charged him with "lack of candor," which encompasses a broader range of misconduct than the narrower falsification charge. The majority of this panel affirms the Board's determination without acknowledging that the Board has failed to follow its established legal precedent requiring intent in order to support a "lack

of candor" charge. *See Boyd v. Dep't of Justice,* 13 MSPB 97, 14 M.S.P.R. 427 (1983); *Friedrick v. Dep't of Justice,* 52 M.S.P.R. 126 (1991).

It appears to me that the majority, by a rather prismatic analysis, first abstains from considering as a matter of first impression the issue of whether the Bureau's lack of candor charge requires a showing of intent by affirming the Board's clearly inconsistent legal conclusion that no such showing is required, while at the same time feels compelled to highlight the circumstantial evidence in this case which might establish such an intent by inference. The majority should clearly state whether or not intent is required to support the charge of lack of candor, and if so, what level of intent is required.

Overlooking the relevant law on this subject, the majority affirms the Board's finding that intent is not required to support the FBI's lack of candor charge. However, a careful review of the cases concerning the FBI's lack of candor standard leaves me unable to understand how the majority can hold that the standard requires no separate showing of intent. Given that each agency can define its own charges, we need to review specifically those lack of candor cases in which the FBI is a party: *Boyd* and *Friedrick.*

Notably, the majority does not cite to *Boyd* as support for its holding that there is no intent requirement for a lack of candor charge. This is because *Boyd* specifically does not support this holding. In *Boyd,* the Board stated that "[i]mplicit in the charge of lack of candor is the allegation that appellant *intentionally* misrepresented the amount of time that he spent at home." 13 MSPB 97, 14 M.S.P.R. at 429 (emphasis added). It stated further that

we find that the agency established by a preponderance of the evidence that ap-

pellant *knowingly misrepresented* this amount of time in the March 6, 1981 interview. Furthermore, we hold that in view of the presiding official's finding that appellant misrepresented his participation in the physical fitness program, the agency supported its charge of lack of candor by a preponderance of the evidence.

*Id.* at 430 (citations omitted) (emphasis added). The *Boyd* case establishes that the Board requires a showing of intent to deceive before upholding a charge of lack of candor.

Similarly in *Friedrick,* the Board affirmed a lack of candor finding, stating "[w]e find that the appellant has failed to show that the administrative judge erred in concluding that the appellant had *intentionally* made an uncandid statement, and thus erred in sustaining charge 1 [lack of candor]." 52 M.S.P.R. at 134 (emphasis added).

The only relevant text cited by the majority for its conclusion that Mr. Ludlum evinced a lack of candor is the FBI's Manual of Administrative Operations and Procedures which states that "[t]he employee must be entirely frank and cooperative in answering inquiries of an administrative nature." The majority overlooks the fact that it is entirely undisputed that Mr. Ludlum was frank and cooperative in answering the inquiries posed to him. It is also undisputed that he admitted that he was unsure as to the specific number of times he drove his daughter home in his Bureau vehicle. Thus, the operative text explaining the standard to be used for assessing Mr. Ludlum's conduct reads in his favor, as does the Board precedent establishing that a finding of intent is required to support a lack of candor charge.

In an effort to cushion the draconian effect of the holding that a lack of candor charge requires no showing of intent, the majority concedes that the charge "necessarily involves an element of deception." Maj. Op. at 1284. At the same time, however, it states that " 'intent to deceive' is not a separate element of that offense—as it is for 'falsification.' " *Id.* at 1285. This text further confuses this jurisprudence by creating an untenable distinction between "elements" and "separate elements." Seeking to distinguish between lack of candor and falsification, the majority has resorted to an alternative analysis that requires either an element of intent or the lack of one, and as a result finds itself in the quagmire of having to conclude either that all unintentional misstatements are sufficient to support a lack of candor charge, or that lack of candor is the same as falsification. In an effort to resolve this dialectic tension, the majority requires deception without requiring intent, even though deception by definition requires intent.

In this case the Board declined to find that Mr. Ludlum had any intent to deceive. Instead it acknowledged Mr. Ludlum's credibility in explaining the discrepancy in the statement. If this court wishes to reprimand Mr. Ludlum on the basis of the wrongfulness of his actions, it should do so by reversing the Board's misapplication of the lack of candor standard, and remanding this case for the Board to apply the correct legal standard, which the majority admits requires at least a minimum degree of intent.

For the foregoing reasons, I respectfully dissent.